UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FRANK W. BALLERO                                    CIVIL ACTION

VERSUS                                              NO. 16-16098

727 INC., ET AL.                                    SECTION "B"(3)

## ORDER AND REASONS

Before the Court are two motions: Defendants 727, Incorporated and 721 Bourbon, Inc.'s "Motion for Summary Judgment" (Rec. Doc. 54) and Defendant Crescent Crown Distributing, LLC's "Motion for Summary Judgment" (Rec. Doc. 55). Plaintiff timely filed response memoranda to both motions. Rec. Docs. 56-57. Defendants 727, Incorporated and 721 Bourbon, Inc. then requested, and were granted, leave to file a reply memorandum. Rec. Doc. 60-1. For the reasons discussed below,

**IT IS ORDERED** that the motions for summary judgment (Rec. Docs. 54-55) are **GRANTED**, and this action is thereby **DISMISSED**. All other pending motions are **DISMISSED AS MOOT**.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case arises out of the sale of a red ale beer known as Pirate's Blood. Rec. Doc. 1 at ¶ 5. Frank W. Ballero ("Plaintiff") claims that he invented and began brewing the beer in 2009. *Id.* He also developed a "logo and mark" for the beer. *Id.* The beer was subsequently sold by various bars, including the Funky Pirate

1

located at 727 Bourbon Street, New Orleans, Louisiana 70116 and owned by 727, Incorporated ("Defendant 727") and Tropical Isle Bourbon located at 721 Bourbon Street, New Orleans, Louisiana 70116 and owned by 721 Bourbon, Incorporated ("Defendant 721"). *Id.; see also* Rec. Doc. 8-1 at 1 n.1.

In March of 2011, Plaintiff stopped producing Pirate's Blood. Rec. Doc. 1 at ¶ 6.[1] Yet, the Funky Pirate and Tropical Isle Bourbon continued to sell a beer called "Pirate's Blood," "use the same exact tap handle bearing [Plaintiff's] Pirate's Blood logo and name," and tell customers that the beer "is locally brewed and sold exclusively" at these two bars. *Id.* In his response to the instant motions, Plaintiff clarifies that Defendants started using Killian's Irish Red Ale as the Pirate's Blood replacement and that, "[i]nstead of using a Killian's Red Ale tap handle, Defendants continued to use the Pirate's Blood tap handle." Rec. Doc. 56 at 2 (citations omitted).

According to Plaintiff, the beer "passing off as Pirate's Blood" is sold and distributed by Defendant Crescent Crown Distributing, LLC ("Crescent"). Rec Doc. 1 at ¶ 7. Crescent regularly visits the Funky Pirate and Tropical Isle Bourbon "to maintain and clean the equipment associated with the product it

---

[1] *See also* Rec. Doc. 56 at 1 (where Plaintiff explains that he stopped distributing Pirate's Blood in March of 2011 after the Covington Brewhouse, formerly known as Heiner Brau Brewhouse, "refused to continue to contract brew the beer") (citation omitted).

has sold, i.e. the beer tap lines," and therefore is "complicit in the deception." *Id.*

Consequently, on November 4, 2016, Plaintiff filed suit requesting injunctive and monetary relief pursuant to § 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a), 1116, 1117, and the Louisiana Unfair Trade Practices Act ("LUTPA"), Louisiana Revised Statute § 51:1401-1428.[2] Rec. Doc. 1 at ¶¶ 12, 15.

In response to Defendants' original motions to dismiss (Rec. Docs. 8, 15), Plaintiff filed an amended complaint on February 2, 2017 asserting that he "met with various persons and companies in 2012, 2013, 2014, and 2015 regarding the production and sale of Pirate's Blood" and that he "fully intended/intends to continue brewing and selling Pirate's Blood under its trademarked name and logo" (Rec. Doc. 21). Before the Court could rule on the original motions to dismiss, Defendants 727 and 721 filed a second motion to dismiss in response to the amended complaint. Rec. Doc. 24. Nonetheless, Defendants' original motions were denied without prejudice on February 22, 2017. Rec. Doc. 29. Defendant Crescent then filed its second motion to dismiss. Rec. Doc. 30.

---

[2] Named as Defendants were 727, Crescent, Tropical Isle Beverages, LLC, and Tropical Isle's Original Papa Joe's, Inc. Rec. Doc. 1 at ¶ 2. In its motion to dismiss, Defendants 727 and 721 explain that they are the owners of the bars at issue and that Tropical Isle Beverages, LLC and Tropical Isle's Original Papa Joe's, Inc. "have no relationship to the factual allegations in the Complaint." Rec. Doc. 8-1 at 1 n.1. Accordingly, those parties were terminated from the suit.

On March 28, 2017, this Court denied the motions to dismiss without prejudice to re-urge on a motion for summary judgment after the exchange of discovery. Rec. Doc. 41 at 15. On August 22, 2017, Defendants accordingly filed the instant motions reiterating the abandonment arguments made in their earlier motions to dismiss. Rec. Docs. 54 at 1; 55 at 1.[3]

## **LAW AND ANALYSIS**

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). *See also TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant must point to "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. If

---

[3] In their motion for summary judgment, Defendant Crescent simply adopted the arguments made by Defendants 721 and 727, pursuant to Federal Rule of Civil Procedure 10(c). Rec. Doc. 55-1 at 1.

and when the movant carries this burden, the non-movant must then go beyond the pleadings and present other evidence to establish a genuine issue. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

However, "where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Lindsey v. Sears Roebuck & Co.*, 16 F.3d 616, 618 (5th Cir. 1994). Conclusory rebuttals of the pleadings are insufficient to avoid summary judgment. *Travelers Ins. Co. v. Liljeberg Enter., Inc.*, 7 F.3d 1203, 1207 (5th Cir. 1993); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) ("conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non[-]movant's burden") (citation omitted).

"To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion. To be protectable, a mark must be distinctive, either inherently or by achieving secondary meaning in the mind of the public." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)(internal citations omitted). *See, e.g., Action Ink, Inc. v.*

*Anheuser-Busch, Inc.*, 959 F. Supp. 2d 934, 948 (E.D. La. 2013), *aff'd sub nom. Action Ink, Inc. v. N.Y. Jets, L.L.C.*, 576 F. App'x 321 (5th Cir. 2014)("A showing of likelihood of confusion presupposes the existence of a valid mark") (citing *La. World Exposition, Inc. v. Logue*, 746 F.2d 1033, 1039-40 (5th Cir. 1984))).

> Yet, "[o]wnership of trademarks is established by use, not by registration." *Union Nat'l Bank of Tex., Laredo, Tex. [v. Union Nat'l Bank of Tex., Austin, Tex.]*, 909 F.2d [839,] 842 [(5th Cir. 1990)]; *see also* 15 U.S.C. § 1127 (defining a trademark as a "word, name, symbol, or device ... used by a person, or which a person has a bona fide intention to use in commerce," and in turn defining "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark" (emphasis added)). And under the Lanham Act, even if a registrant has owned the mark at one time—indeed, even if the trademark registration has become inconstestable—an opposing party may successfully defend against an infringement claim by showing that the registrant has abandoned the mark. *See* 15 U.S.C. § 1115(b)(2). A mark is deemed abandoned if "its use has been discontinued with an intent not to resume such use." 15 U.S.C. § 1127.

*Action Ink*, 959 F. Supp. 2d at 942. Similarly, actions for false designation of origin under the Lanham Act or for unfair competition under either the Lanham Act or the LUTPA may be defended against by demonstrating that the plaintiff abandoned their use of the mark. *Id.* at 948 (citing *Riggs Mktg. Inc. v. Mitchell*, 993 F. Supp. 1301, 1305 (D. Nev. 1997)).

"The party asserting abandonment must establish that the owner of the mark both (1) discontinued use of the mark and (2)

intended not to resume its use." *Action Ink, Inc. v. N.Y. Jets, LLC*, No. 12-46, 2013 WL 12106878, at *3 (E.D. La. June 20, 2013), *adhered to on denial of reconsideration,* 2013 WL 5532781 (E.D. La. Oct. 4, 2013), *aff'd sub nom.* 576 F. App'x 321 (citation omitted) (granting summary judgment in favor of the defendants on claims of federal trademark infringement and false designation of origin under the Lanham Act, as well as for common law trademark infringement and unfair competition).

Further, under the Lanham Act, nonuse "for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. This creates a "rebuttable presumption of intent not to resume [use]." *Action Ink*, 2013 WL 12106878, at *4 (quoting *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1172 (11th Cir. 2002)). "Once the rebuttable presumption . . . has been established, the burden of production then '[s]hifts to [the holder] to produce evidence that [it] either used the mark during the statutory period or intended to resume use.'" *Id.* (quoting *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008)). The intent to resume use must manifest during the three-year period of non-use. *Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 594 (N.D. Ill. 2010), *judgment entered,* No. 09-2572, 2011 WL 4737179 (N.D. Ill. Oct. 6, 2011), and *aff'd,* 747 F.3d 929 (7th Cir. 2014) (citations omitted); *Buck v. Palmer*, No. 08-572, 2013 WL 11323280, at *3 (W.D. Tex. July 10, 2013) (citation

omitted) (further noting that "evidence adduced after the three-year period is relevant to the extent it demonstrates intent during the period"); *Louangel, Inc. v. Darden Rests., Inc.*, No. 12-147, 2013 WL 2452664, at *2 (S.D. Tex. June 5, 2013) (citation omitted).

However, "[t]he intent to resume cannot be far-flung or indefinite; rather there must be an intent to resume use within the reasonably foreseeable future." *Action Ink*, 2013 WL 12106878, at *8 (quoting *Nat. Answers*, 529 F.3d at 1330 (quoting *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989))) (quotation marks omitted). "Essentially, the trademark holder must come forward with <u>objective</u>, hard evidence of actual concrete plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate." *Id.* (quoting *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 268 (S.D.N.Y. 2002) (quoting *Silverman*, 870 F.2d at 46))(emphasis added). "Thus, 'a bare assertion of possible future use is not enough' to prove an intent to resume use." *Id.* (quoting *Silverman*, 870 F.2d at 47).

In *Action Ink*, after a fifteen-year period of nonuse, renewal of the mark and actions against alleged infringers, in light of the fact that there was no evidence that the holder used the mark in commerce or had plans to use the mark in commerce, were "minor activities" that were "inadequate to show an intent to resume use." 2013 WL 12106878, at *9-10. Further, the holder's declaration that there was never an intention to abandon the mark amounted to "self-

serving testimony" that was insufficient to defeat summary judgment. *Id.* at *10.

Similarly, in *Silverman*, the Second Circuit determined that the holder's "actions in licensing the programs for limited use in connection with documentary and educational programs, challenging infringing uses brought to its attention, renewing its copyrights, and periodically reconsidering whether to resume use of the programs" were minor activities that did not amount to use. 870 F.2d at 47-48. "Such uses do not sufficiently rekindle the public's identification of the mark with the proprietor, which is the essential condition for trademark protection, nor do they establish an intent to resume commercial use." *Id.* at 48.

In *Specht v. Google Incorporated*, the holder pointed to four activities that he believed showed his continued use of the mark: (1) he attempted to sell his business assets; (2) he did not cancel his phone service; (3) he continued operating his website; and (4) he conducted two sales efforts, including a mass mailing and a failed bid to license software. 747 F.3d 929, 934-35 (7th Cir. 2014). According to the Seventh Circuit, these activities did not amount to "use" because (1) "an effort to sell the assets of a business is different from trading on the goodwill of a trademark to sell a business's goods or services"; (2) his phone expenses for the year after he allegedly stopped using the mark were included in a balance sheet from the previous year "precisely

because, in his view, [the company] did not operate in [the later year]"; (3) "he did not identify any goods or services [the company] could have provided through or in connection with the website after [his use allegedly ceased]"; and (4) his sales efforts "were isolated and not sustained; sporadic attempts to solicit business are not a 'use in commerce' meriting the protection of the Lanham Act." *Id.* (citations omitted). The plaintiff's argument that the mass mailing evidenced an intent to resume use failed because, by that time, the defendant had publicized its use of the mark; in other words, by the time of the mass mailing, the mark was permanently abandoned. *Id.* at 935–36.

In *Rivard v. Linville*, the plaintiff appealed the Trademark Trial and Appeal Board's decision to cancel his registered mark for ULTRACUTS, used in connection with hair and beauty salon services, because he abandoned the mark without an intention to commence use in the United States. 133 F.3d 1446, 1447 (Fed. Cir. 1998). The plaintiff registered the mark in 1986, but the defendant filed a petition to cancel the mark in 1991. *Id.* at 1447–48. During the litigation, the plaintiff produced evidence that in 1984 he examined a competitor's salon and met with a commercial realtor in Hawaii; in 1986 he discussed leasing space in a Minneapolis mall; in 1987 he discussed franchising issues with a Minneapolis consultant (and was convinced to concentrate on developing a franchise in Canada) and traveled to Tampa to examine a

competitor's operation; in 1988 he traveled to Tampa and Las Vegas and considered opening salons in those locations; in 1989 he again traveled to Tampa to examine competitors' locations and investigate purchasing an existing salon; in 1990 he traveled to North Dakota to investigate salon locations; and in 1991 he met with the manager of a Grand Forks mall. *Id*. at 1448. Under the law in effect in 1991, "a petitioner established a *prima facie* case of abandonment with proof of nonuse in the United States for two consecutive years." *Id.* at 1449 (citations omitted). The court found that the defendant established a *prima facie* case of abandonment because the plaintiff did not use the mark in connection with hair and beauty salon services in the United States during the relevant time period. *Id.* It subsequently found the plaintiff's proffered evidence insufficient to rebut the presumption of abandonment. *Id.* The court described this evidence as "sporadic trips to the United States, cursory investigations of potential sites for salons, and half-hearted attempts to initiate the business relationships necessary to open a salon." *Id.* The court accordingly affirmed the Board's decision to cancel the registration. *Id.* at 1450.

In this case, Plaintiff admitted that he "ceased production of Pirate's Blood in March of 2011." Rec. Docs. 1 at ¶ 6; 54-3 at 38. He also admitted that he did not advertise Pirate's Blood at any time from April of 2011 to the present. Rec. Doc. 54-3 at 40.

Therefore, there is evidence that Plaintiff discontinued use of the mark. *Action Ink*, 2013 WL 12106878, at *3. However, Plaintiff's amended complaint suggested that he "met with various persons and companies in 2012, 2013, 2014, and 2015 regarding the production and sale of Pirate's Blood. [Plaintiff] fully intended/intends to continue brewing and selling Pirate's Blood under its trademarked name and logo." Rec. Doc. 21 at ¶ 6(A). This Court previously found those allegations minimally sufficient to warrant discovery and survive the motion to dismiss stage. After subsequent discovery, however, they do not survive the instant motions for summary judgment.

The record shows Plaintiff had some interactions with breweries between 2012 and 2017. Rec. Doc. 54-2 at 7. Specifically, he contacted Brian Broussard of Covington Brewhouse at various times between 2012 and 2014 (Rec. Doc. 54-3 at 47-48, 56-58)[4] and otherwise made informal visits to Pensacola

---

[4] Defendants subpoenaed documents from Covington Brewhouse. Rec. Docs. 54-2 at 7 n.1; 54-4 at 5-12. In response, Covington Brewhouse produced an e-mail string. Rec. Doc. 54-4 at 13-18. Plaintiff e-mailed Broussard on March 14, 2014 outlining his five-year relationship with Heiner Brau and New Orleans Beer Company and explaining that "Pirate's Blood Red Ale was an established product in the marketplace and a profitable venture . . . . I would like very much to establish a new relationship with Covington Brewhouse to contract brew Pirate's Blood Red Ale. Is it possible to set up a meeting to discuss?" *Id.* at 17-18. The rest of the string consists of internal emails between Covington Brewhouse representatives. *Id.* at 13-17. They concluded that they were not interested in doing business with Plaintiff. *Id.* at 13. During his deposition, Plaintiff admitted that he "went to the brewery without announcing myself just to get in there and see" and that "there was hardly ever any prearranged meetings ever done. You pop in somebody, get in their face and you ask them a question. That's what we have to do." Rec. Doc. 54-3 at 57-58.

Bay Brewery in 2013 (*id.* at 51-53),[5] Gulf Coast Brewing between 2015 and 2017 (*id.* at 54-55),[6] 40 Arpent Brewery between 2014 and 2016 (*id.* at 67-69),[7] and to Royal Brewery in 2017 (*id.* at 72). However, discovery showed that Plaintiff never (1) scheduled a formal meeting with any of these breweries, (2) submitted a formal proposal about producing Pirate's Blood, or (3) negotiated any type of contract. None of the breweries produced Plaintiff's beer for sale. *Id.* at 115.

Plaintiff argues that, in addition to the activities noted above, he (1) had Pirate's Blood home-brewed during 2011 and 2012 in order to enter it into the Emerald Coast Beer Festival, a "beer tasting event for charity purposes" (Rec. Doc. 56 at 3 (citing Rec. Doc. 56-1 at 11)); and (2) filed to trademark the Pirate's Blood name and logo on September 18, 2014 and subsequently litigated two oppositions to the trademark for the ensuing year and a half (*id.* at 4 (citing Rec. Doc. 56-1 at 34, 82-106)).[8]

[5] Again, Defendants subpoenaed documents from Pensacola Bay Brewery. Rec. Doc. 54-4 at 20-27. Pensacola Bay Brewery objected to the subpoena as improperly served and in violation of Federal Rule of Civil Procedure 45(c)(2)(A). *Id.* at 28-29. Nonetheless, it also stated that it had no knowledge of any responsive documents. *Id.* at 29. During his deposition, Plaintiff again explained that he would "just show up" at the brewery. Rec. Doc. 54-3 at 52-53.

[6] Again, Defendants subpoenaed documents from Gulf Coasting Brewing. Rec. Doc. 54-4 at 31-38. A brewery representative responded that it had "no documents, [n]otes or discussions recorded or anything that I can offer." *Id.* at 39.

[7] Again, Defendants subpoenaed documents from 40 Arpent Brewery. Rec. Doc. 54-4 at 41-48. The response included only an e-mail from Plaintiff who explained that "You have not brewed my Pirate's Blood therefore [t]here are no documents." *Id.* at 49. In his response to the instant motions, Plaintiff explains that 40 Arpent Brewery "halted all potential negotiations until after this litigation is resolved." Rec. Doc. 56 at 4 (citing Rec. Doc. 56-1 at 18-19)).

[8] The application apparently remains pending after one of the oppositions was withdrawn. Rec. Doc. 56-1 at 89, 103.

Plaintiff further argues that the various cases cited by Defendants are distinguishable because he must rely "upon a brewery to make his product. Thus, if a brewery decides to not contract brew Pirate's Blood, then Pirate's Blood will not be used in the ordinary course of trade." Rec. Doc. 56 at 8. He maintains that his various activities evidence his intent to resume use of the Pirate's Blood mark and therefore amount to a genuine issue of material fact precluding summary judgment. *Id.* at 10.

Plaintiff's participation in the beer festival and subsequent trademark efforts are insufficient to overcome the presumption of abandonment. *See, e.g.*, *Hughes v. Design Look Inc.*, 693 F. Supp. 1500, 1506 (S.D.N.Y. 1988) (noting that the use of unrelated images "to sell products on two occasions, [was] not sufficient to overcome the inference of abandonment"); *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 539 (4th Cir. 2000) ("the 'use' required to preserve trademark rights does not include mere promotional or token uses"); *Exxon Corp. v. Humble Expl. Co.*, 695 F.2d 96, 99 (5th Cir. 1983) (determining that limited sales of products with the HUMBLE mark on the label and the use of the mark on invoices were not sufficient where the sales did not depend on the mark "for identification of source. To the contrary, purchasers were informed that the selected shipments would bear the HUMBLE name or be accompanied by an HUMBLE invoice but were the desired Exxon products. That is, the HUMBLE mark did not with these sales

play the role of a mark. That casting, however, is central to the plot that the Lanham Act rests on the idea of registration of marks otherwise born of use rather than the creation of marks by the act of registration. That precept finds expression in the Lanham Act requirement that to maintain a mark in the absence of use there must be an intent to resume use . . . The Act does not allow the preservation of a mark solely to prevent its use by others.").

Further, Plaintiff's filing of a trademark application does not rebut evidence here of the prior abandonment. *Action Ink*, 2013 WL 12106878, at *10 (where the renewal of a registration after abandonment was insufficient).

We are unable to meaningfully distinguish Plaintiff's sporadic contacts with various breweries from the sales efforts in *Specht* and the occasional meetings in *Rivard*. Plaintiff's contacts with the breweries were "sporadic attempts to solicit business" (747 F.3d at 935) and "half-hearted attempts to initiate the business relationships necessary to" produce Pirate's Blood (133 F.3d at 1450). Plaintiff's participation in the Emerald Coast Beer Festival is similarly insufficient. It is comparable to the *Silverman* plaintiff's licensing of the programs for limited use in documentary and educational programs; it was a "minor activity" that did not "sufficiently rekindle the public's identification of the mark with the proprietor . . . ." 870 F.2d at 47-48. Even if this activity was sufficient to overcome the presumption, it took

place five years ago, in 2012. Plaintiff's filing of a trademark application does not amount to "use in commerce," the "bona fide use of [the] mark in the ordinary course of trade" (15 U.S.C. § 1127) and is therefore insufficient to overcome the presumption. Further, "[c]hallenging infringing uses . . . is not use and is insufficient to forestall abandonment . . . . Essentially, such use neither sufficiently rekindles the public's identification of the mark with the proprietor, which is the essential condition for trademark protection, nor establishes an intent to resume commercial use." *Action Ink*, 2013 WL 12106878, at *9 (citation and alterations omitted). Finally, Plaintiff failed to cite to any case in which summary judgment was denied because the plaintiff's "use" of the mark was outside his control. It is true that "temporary abandonment is excusable when non-use is caused by changing or distressed market conditions." *Action Ink*, 2013 WL 12106878, at *8 (citations omitted). However, Plaintiff failed to present evidence of an "unstable or depressed market condition" (*id.*) or otherwise demonstrate "that, under his particular circumstances, his activities [were] those that a reasonable businessman, who had a bona fide intent to use the mark in United States commerce, would have undertaken" (*Rivard*, 133 F.3d at 1449).

Ultimately, "[t]he mere fact that [Plaintiff] did not intend to abandon the Mark is insufficient as a matter of law" and "'a businessman intending to resume commercial use of his mark would

or should not allow [a six-year] lapse to occur.'" *Action Ink*, 2013 WL 12106878, at *9-10 (considering a fifteen-year lapse) (quoting *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1532 (11th Cir. 1985) (considering a four-year lapse)).

New Orleans, Louisiana, this 22nd day of September, 2017.

SENIOR UNITED STATES DISTRICT JUDGE